United States Court of Appeals,

Fifth Circuit.

No. 93-4181.

Rose Ana Forbes LEMELLE, et al., Plaintiffs,

Rose Ana Forbes Lemelle, Plaintiff-Appellant,

v.

UNIVERSAL MFG. CORP., et al., Defendants,

Universal Mfg. Corp., Defendant-Appellee,

Werts Novelty Co., Inc., Defendant-Appellee,

USF & G, Defendant-Appellee.

April 15, 1994.

Appeal from the United States District Court for the Western District of Louisiana.

Before POLITZ, Chief Judge, KING and DAVIS, Circuit Judges.

KING, Circuit Judge:

Rosemary Forbes, the mother of decedents Michael Tyrone Forbes and John Clarence Berchman Forbes, filed suit in federal district court against Universal Manufacturing Corp. and United States Fidelity and Guaranty Co. for the wrongful death of the decedents. The district court entered summary judgment for the defendants, and the plaintiff appeals. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

I. BACKGROUND

A. *Factual Background*

Winston Mobile Homes, Inc. was incorporated in Alabama on August 10, 1965. On April 24, 1969, the corporation changed its name to Winston Industries, Inc. (Winston). Winston was a business generally involved with the manufacture, marketing, and sale of mobile homes.

On September 9, 1982, Winston—a wholly-owned subsidiary of Shelter Resources Corp. (Shelter), a Delaware corporation—filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio. Shelter and another

of its wholly-owned subsidiaries, Lancer Homes, Inc.—a California corporation—filed voluntary petitions under Chapter 11 at the same time. The bankruptcy court consolidated all three proceedings for administrative purposes only.

On November 29, 1982, pursuant to a court order, the consumer products division of Winston was sold to American Consumer Products, Inc. (American). On January 4, 1983, pursuant to the same court order, Winston's operating assets relating to the production and sale of manufactured housing were sold to Don N. Tidwell. Tidwell gave as consideration for Winston's manufacturing assets $3,137,000 in cash and the secured assumption of accrued warranty liabilities totalling $2,399,000. After the sales to American and Tidwell, Winston's remaining assets were its corporate books and records, some cash, an income tax refund due from the sale of one of its foreign subsidiaries, notes and an account receivable from the sale of its foreign subsidiaries, and approximately twenty-four acres of undeveloped real property in Orangeburg, South Carolina.

Winston then filed its reorganization plan with the bankruptcy court on January 7, 1983. The bankruptcy court confirmed the reorganization plan on August 30, 1983, and Winston was discharged. Shelter continued to own all of the issued and outstanding capital stock of Winston.

On September 20, 1985, Werts Novelty Co. (Werts)—a Delaware corporation—purchased all of the issued and outstanding shares of capital stock of Winston from Shelter. Five days later, Winston—still an Alabama corporation—was merged into Universal Chicken Farms, Inc., a Delaware corporation and a wholly-owned subsidiary of Werts. The surviving corporation was named Winston Industries, Inc. (Winston II). On November 25, 1985, Winston II was merged into Universal Manufacturing Corp. (Universal), another subsidiary of Werts. On March 13, 1987, Werts was merged with Universal.

B. *Procedural History*

Rosemary Forbes (Forbes), the mother of Michael Tyrone Forbes and John Clarence Berchman Forbes (decedents), brought suit against Universal in the United States District Court for

the Eastern District of Louisiana on January 17, 1986, on the basis of diversity jurisdiction.[1]  The suit was transferred to the Western District of Louisiana on August 13, 1986.  Subsequently, Forbes also named United States Fidelity and Guaranty Company (USF & G), Universal's liability insurer, as a co-defendant.[2]

Forbes alleged that on December 24, 1985, a fire and the resulting damage, caused by the design and manufacture of a mobile home, directly resulted in the death of the decedents.  The mobile home in question had been designed and manufactured by Winston in approximately 1970.

Universal filed a motion for summary judgment on November 2, 1987, asserting that Forbes' claim, premised on an act that did not occur until a time subsequent to Winston's discharge from bankruptcy under Chapter 11 in 1983, had been effectively foreclosed because the bankruptcy court had discharged from Winston "all supplications, demands, and/or claims of whatever character, whether provisional, liquidated, or unliquidated, fixed or contingent."  Universal alternatively asserted that neither Universal nor Werts was a successor corporation to Winston and hence could not be liable for the wrongful deaths of the decedents.  Universal pointed out that prior to the bankruptcy court's confirmation of Winston's reorganization plan, the operational and manufacturing assets of Winston had been sold at a court-ordered sale to Tidwell and that all that remained of Winston was a "corporate shell."  It was this "corporate shell," Universal argued, that was eventually merged into other corporations and then into Universal, indicating that Universal was not a successor corporation of Winston's mobile home manufacturing business.

On December 23, 1987, the district court granted Universal's motion, dismissing Forbes' claim against Universal.  The court stated that Winston's reorganization plan "clearly discharged Winston II from *all* obligations and demands" and that Universal had merged with Winston II on that basis. The court further stated that "[t]o hold otherwise would rearrange the careful planning and the balance of equities inherent in a bankruptcy reorganization, and would expose the purchaser of a

---

[1]Although the decedents' biological siblings were originally listed as plaintiffs, they were dismissed from the suit as not being proper parties in interest.

[2]Forbes also subsequently named other defendants, none of whom is involved in this appeal.

reorganized corporation to astronomical, unpredictable liability."  On January 25, 1988, USF & G filed a motion for summary judgment, asserting that inasmuch as Universal had been granted summary judgment, there could be no damages to Forbes for which USF & G was legally obligated to pay. On February 8, 1988, the court denied Forbes' motion for rehearing and granted USF & G's motion for summary judgment.  Forbes' claims against other defendants remained.

Nearly four years later, on January 31, 1992, Forbes sought reconsideration of the district court's rulings of December 23, 1987, and February 8, 1988.  The district court denied Forbes' request, stating that although it agreed with Forbes that a tort claim was not cognizable in reorganization unless the cause of action accrued under non-bankruptcy law prior to the confirmation of a plan, it did not agree that Universal was a successor corporation that would have liability for Winston's manufacture of mobile homes.  The court  based this decision on the facts that all of Winston's manufacturing and operational assets had been sold at public sale and that its mobile home business had been completely liquidated.  The court thus determined that Universal, as a successor corporation, would have no liability for Forbes' tort claim.

Forbes filed a timely notice of appeal.  This court dismissed her appeal, however, because a certification that the district court's rulings of December 23, 1987, and February 8, 1988, were final under Federal Rule of Civil Procedure 54(b) had not been issued.  *See Forbes v. Universal Manufacturing Co.,* No. 88-4201 (5th Cir. May 3, 1988) (unpublished opinion).  On January 14, 1993, Universal and USF & G obtained a certification of final judgment on these rulings pursuant to Rule 54(b).  This appeal then ensued.

## II. STANDARD OF REVIEW

We review the granting of summary judgment *de novo,* applying the same criteria used by the district court in the first instance.  That is, we review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party.  *Federal Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1306 (5th Cir.1993);  *Fraire v. City of Arlington,* 957 F.2d 1268, 1273 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c).

## III. DISCUSSION

Forbes argues on appeal that the district court erred in granting summary judgment to Universal and USF & G.  Forbes contends that summary judgment in favor of Universal and USF & G was improper because (1) Universal, as a successor corporation of Winston through statutory mergers, can be held liable for Winston's delictual acts, (2) the causes of action involved in this case did not accrue until December 1985 and that thus could not have been discharged by the bankruptcy court's confirmation of Winston's reorganization plan in 1983, and (3) USF & G can be held liable insofar as it was Universal's liability insurer at the time her cause of action accrued.  We address each of Forbes' arguments in turn.

### A. *Successor Corporation Liability*

Forbes' first argument centers on the fact that Winston was not liquidated as a result of its Chapter 11 proceedings.  According to Forbes, Winston continued to exist as a viable corporation, albeit restructured, after its reorganization plan was confirmed and it was discharged in 1983.  She asserts that because Winston was eventually merged into Universal, applicable state statutory merger laws make it clear that Universal can now be held liable for her claim.

The essence of Universal's contention, however, is that because Winston's reorganization plan provided that Winston's consumer products division and its operating assets relating to the production and sale of mobile homes had been liquidated, the confirmation of that plan constituted the liquidation of Winston.  According to Universal, the corporation that was eventually merged into it was only a "corporate shell," a different legal entity than that which had existed prior to the Chapter 11 proceedings.  Universal therefore asserts that Forbes' claim against Universal is precluded under any theory of successor liability.  Alternatively, Universal contends that because Tidwell expressly assumed Winston's liabilities for its mobile home operations when he purchased Winston's manufacturing assets in 1983, it is Tidwell and not Universal who can be held liable for Forbes' claim.

The purpose of Chapter 11 reorganization is " "to assist financially distressed business

enterprises by providing them with breathing space in which to return to a viable state.'" *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1073 (5th Cir.1986) (quoting *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir.1985)). Such reorganization thus permits the rehabilitation of an ongoing business.

We have recognized that the Bankruptcy Code does, however, contemplate liquidating reorganizations. *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346, 1352 (5th Cir.1989) (determining that sections 1129(a)(11), 1123(a)(5), and 1123(b)(4) of the Bankruptcy Code indicate that a reorganization plan may result in the liquidation of the debtor). Although the distribution of all the debtor's property to creditors under a liquidating plan of reorganization is not improper under the Code, the bankruptcy court's approval of a liquidating plan of reorganization does not *ipso facto* liquidate the corporation.

The record indicates that Winston was not liquidated. Winston's reorganization plan specifically states that if the plan received court approval, Winston's board of directors could then "determine whether or not they wish[ed] to merge or consolidate, or dissolve...." The plan itself thus specifically contemplated the corporation's continued existence as a viable corporate entity. Winston's disclosure statement likewise contemplated Winston's continued corporate existence after Winston emerged from reorganization proceedings. The disclosure statement pronounced that "[t]he Debtor's objective is to consummate a public sale of the Assets as set forth herein for the highest and best bid ... as quickly as possible in order to *preserve the viability of the Debtor's Business as a going concern....*" Further, Winston continued to exist as a corporate entity under Alabama law until September 1985 when it was merged into Universal Chicken Farms, pursuant to statutory provisions of Alabama and Delaware law. We thus conclude that the bankruptcy court's approval of Winston's reorganization plan did not *liquidate* Winston.[3]

---

[3]We note that Universal relies on *Erie Lackawanna Ry. Co. v. Henning (In re Erie Lackawanna Ry. Co.),* 803 F.2d 881 (6th Cir.1986), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2463, 95 L.Ed.2d 872 (1987), for support of its position that Winston's restructuring was effectively a liquidation and that Universal is therefore not liable as a successor corporation for Forbes' claim. Nonetheless, Universal's reliance on *Erie* is misplaced. In reaching its conclusion, the *Erie* court considered facts admittedly unique to Erie's situation, the most important of which was that Erie's restructuring was a hybrid proceeding involving both Chapter 11 and the Rail Act. *Id.* at 882.

We also conclude that pursuant to applicable statutory law, Universal is a successor corporation of Winston and, as such, is legally responsible for all of Winston's liabilities, including the possible liability for Forbes' claim. As noted above, in September 1985, Winston was merged into Universal Chicken Farms, pursuant to statutory provisions of Alabama and Delaware law. The surviving corporation, Winston II, existed as a Delaware corporation. Under both Alabama and Delaware law, the assets and liabilities of merging corporations become the responsibility of the surviving corporation. *See* ALA.CODE ANN. 10-2A-145 (1975)[4]; DEL.CODE ANN. tit. 8, § 259 (1953).[5] Hence, Winston II became legally responsible for the liabilities of both Universal Chicken Farms and Winston, including negligence and products liability claims against Winston.

The record also indicates that in November 1985, Winston II was merged into Universal, pursuant to statutory provisions of Delaware law. Universal thus became responsible for Winston

---

The court thus determined that although Erie had gone through reorganization in form, in *substance* it had been liquidated, pursuant to the flexibility which the Rail Act provided. *Id.* at 885. The instant case, however, involves no "hybrid" reorganization proceeding like that which the Sixth Circuit analyzed in *Erie*.

[4]The Code of Alabama states in pertinent part:

> If the surviving or new corporation [from a merger between a domestic and a foreign corporation] is to be governed by the laws of any state other than this state, the effect of such merger or consolidation shall be the same as in the case of the merger or consolidation of domestic corporations except insofar as the laws of such other state provide otherwise.

ALA.CODE ANN. § 10-2A-146(b) (1975).

> Such surviving or new corporation shall thenceforth be responsible for all the liabilities and obligations of each of the corporations so merged or consolidated....

*Id.* at § 10-2A-145(b)(5).

[5]The Delaware Code provides in pertinent part:

> When any merger or consolidation shall have become effective under this chapter ..., all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

DEL.CODE ANN. tit. 8, § 259(a) (1953).

II's liabilities, including those which Winston II had assumed from Winston and Universal Chicken Farms.

Universal also argues, however, that even if it is deemed to be a successor corporation of Winston, Winston's liabilities at issue in this case were expressly assumed by Tidwell, according to the terms of the purchasing agreement by which Tidwell purchased the manufactured housing production division of Winston and which was approved by order of the bankruptcy court on January 6, 1983. Universal asserts that these liabilities included *all* liabilities generated by Winston's pre-petition manufacturing activities and that thus the possible liability for Forbes' claim lies only with Tidwell.

As an initial matter, we express some doubt that Universal's assertion is, as a matter of fact, true. Exhibit A to Winston's reorganization plan reflects that Tidwell assumed *accrued* warranty liabilities and actually identifies the aggregate amount of those liabilities appearing on a December 24, 1982, financial statement. As a matter of generally accepted accounting principles, it is doubtful that Winston's ultimate liability to Forbes was "accrued" as of December 24, 1982. More important, however, is the fact that the terms of Tidwell's purchase, and the associated court order, are not a part of the record. Universal, as the party moving for summary judgment, had the responsibility for bringing forward that documentation to establish that no genuine issue of fact existed for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (explaining that the party seeking summary judgment always bears the initial responsibility of demonstrating to the district court the absence of a genuine issue of material fact, even when the non-movant bears the burden of proof at trial); *Russ v. Int'l Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991) (noting that the movant must satisfy its obligation that there are no fact issues warranting trial before the non-movant is required to produce any evidence in opposition to the summary judgment motion). This Universal failed to do, and summary judgment on this theory was, therefore, improper.[6]

[6]Although this argument, in theory, remains open on remand, we express some skepticism about the likelihood of Universal's being able to establish that Tidwell agreed to assume, on an open-ended basis, future liabilities of the sort at issue in the instant case. We also note that the

B. *Discharge of Liabilities*

Forbes also asserts that the district court erred in determining that Winston's reorganization plan "clearly discharged Winston II from *all* obligations or demands," including the possible liability on her tort claim. We agree.

Section 101(5) of the Bankruptcy Code defines "claim," in relevant part, as a

> *right to payment,* whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

11 U.S.C. § 101(5)(A) (emphasis added). However, "determination of whether a claim arises in bankruptcy requires an analysis of interests created by non-bankruptcy substantive law." *In re National Gypsum Co.,* 139 B.R. 397, 405 (N.D.Tex.1992); *see also Kilbarr Corp. v. General Servs. Admin. (In re Remington Rand Corp.),* 836 F.2d 825, 830 (3d Cir.1988) (explaining that "unless state or federal law independently creates obligations, the bankruptcy court is not presented with a claim to either recognize or reject").

Forbes points out that under Louisiana law, a cause of action in tort accrues when the injured party has a right to sue. *Cole v. Celotex Corp.,* 599 So.2d 1058, 1063 n. 15 (La.1992); *see Trahan v. Liberty Mut. Ins. Co.,* 314 So.2d 350, 353 (La.1975) (determining that "[t]he cause of action is the state of facts which gives a party a right to judicially assert an action against the defendant"). Accordingly, she asserts that her cause of action accrued on December 24, 1985—the date on which the mobile home in question caught fire and allegedly emitted toxic gases, causing the deaths of the decedents—more than two years after Winston's reorganization plan was confirmed. Forbes thus argues that because she did not have a cause of action against Winston until December 1985, she did not have a "claim" which could have been dealt with during Winston's bankruptcy proceedings.

The legislative history of the Code indicates that Congress intended the term "claim" to be given broad interpretation so that "all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 1st

---

fact that Tidwell assumed certain liabilities does not necessarily mean that the holder of a claim for such a liability would be compelled to look only to Tidwell for satisfaction of that liability. Again, the terms of the agreement and the court order would be critical.

Sess. 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6266;  *see Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 707, 83 L.Ed.2d 649 (1985).  Based upon the legislative history of the Code and the express language of section 101(5)(A), we have recognized that the definition of "claim" under the Code is much broader than that which existed under the former Bankruptcy Act.[7]  *See, e.g., Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft Inc.),* 730 F.2d 367, 375 n. 6 (5th Cir.1984).

The question of how broad the term "claim" is under the Code, especially as that term relates to unaccrued tort liability, is a complex one.  Some courts have agreed with the view Forbes has taken in this case:  a "claim" does not arise in bankruptcy until a cause of action has accrued under non-bankruptcy law.  *See, e.g., Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.),* 744 F.2d 332, 337 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). Other courts, however, have rejected this theory on grounds that such a theory interprets the term "claim" more narrowly than Congress intended.  *See, e.g., In re A.H. Robins Co.,* 63 B.R. 986, 989-92 (Bankr.E.D.Va.1986), *aff'd sub nom. Grady v. A.H. Robins Co.,* 839 F.2d 198 (4th Cir.), *cert. dismissed,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988);  *Edge v. Roach (In re Edge),* 60 B.R. 690, 696-705 (Bankr.M.D.Tenn.1986);  *In re Johns-Manville Corp.,* 57 B.R. 680, 686-90 (Bankr.S.D.N.Y.1986).  Some courts that have rejected the accrual theory have determined that a right to payment, and thus a "claim" under the Code, arises at the moment the conduct giving rise to the alleged liability occurred.  *See, e.g., Grady v. A.H. Robins Co. (In re A.H. Robins Co.),* 839 F.2d 198, 202-03 (4th Cir.), *cert. dismissed,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.),* 141 B.R. 552, 556 (Bankr.S.D.N.Y.1992), *vacated on other grounds,* 157 B.R. 220 (S.D.N.Y.1993). These courts have concluded that if a debtor's conduct forming the basis of liability occurred pre-petition, a "claim" arises under the Code when that conduct occurs, even though the injury resulting from this conduct is not manifest at the commencement of the bankruptcy proceedings.  *See* 3 DAVID G. EPSTEIN ET AL.,

---

[7]Under the Bankruptcy Act, the term "claim" was only used with the concept of "provability" in section 63 of the Act "to limit the kinds of debts that were payable in a bankruptcy case." *Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft Inc.),* 730 F.2d 367, 375 n. 6 (5th Cir.1984).  As a result, the bankruptcy court could not sell assets of the debtor free and clear of many contingent and unliquidated claims, including contingent tort claims. *See id.* at 375.

BANKRUPTCY § 10-32, at 61 (1992) (explaining that the group of persons having a "claim" against a debtor in bankruptcy arguably includes a tort claimant "who has suffered an injury, but who is not yet aware of that injury").

For example, in *A.H. Robins,* the plaintiff had been inserted with a Dalkon Shield, a contraceptive intra-uterine device, manufactured and marketed by A.H. Robins Co. (Robins), prior to the time Robins filed its petition for reorganization under Chapter 11.  839 F.2d at 199.  Shortly after Robins filed its petition, the plaintiff's injuries related to the Dalkon Shield became manifest, and she filed suit against Robins in federal district court.  *Id.*  She also filed a motion in the bankruptcy court, requesting that her "claim" not be stayed under the automatic stay provision of the Code because her claim arose post-petition.  *Id.*  The Fourth Circuit disagreed, stating that the plaintiff's claim was undoubtedly "contingent" in that it was dependent "upon a future uncertain event, that event being the manifestation of injury from use of the Dalkon Shield."  *Id.* at 203.  The court went on to make it clear that it did not believe that

> there must be a right to the immediate payment of money in the case of a tort or allied breach of warranty or like claim, as present here, when the acts constituting the tort or breach of warranty have occurred prior to the filing of the petition, to constitute a claim....

*Id.* at 203.  Thus, the court determined that the plaintiff's "claim" arose before the commencement of bankruptcy proceedings and as such was a pre-petition claim subject to the Code's automatic stay provision.  *Id.; see also Waterman,* 141 B.R. at 556 (determining that a "claim" arose at the moment the plaintiffs came into contact with asbestos, even though their injury was not manifest until years later); *Edge,* 60 B.R. at 705 (concluding that a "claim" arose for purposes of the Code's automatic stay provision at the time the patient received negligent treatment from the debtor dentist).

Other courts have not viewed the timing of a debtor's negligent conduct as dispositive of when a "claim" arises under the Code.  Instead, they have determined that a claim arises at the time of the debtor's negligent conduct forming the basis for liability *only if* the claimant had some type of specific relationship with the debtor at that time.

For example, in *In re Piper Aircraft Corp.,* 162 B.R. 619 (Bankr.S.D.Fla.1994), Piper Aircraft Corp. (Piper) was attempting to reorganize under Chapter 11.  *Id.* at 621.  Assuming that

aircraft designed and manufactured by Piper pre-petition would crash and injure persons and property post-petition, a legal representative filed a proof of claim on behalf of potential future claimants for $100 million. *Id.* at 621-22. This proof of claim was based on statistical assumptions regarding the number of people who were likely to suffer personal injury or property damage after Piper's reorganization plan was confirmed. *Id.* at 622. However, the *Piper* court disallowed this claim on grounds that the potential future claimants in this case did not have a "claim" as defined in section 101(5)(A) of the Code. *Id.* at 629.

The court began by clearly setting forth the problem posed before it in determining whether the future claimants had "claims" under the Code which could be affected by Piper's reorganization and the confirmation of its plan. The court stated:

> We know that some planes in the existing fleet of Piper aircraft will crash, and we know that there may be injuries, deaths and property damage as a result. We also know that under theories of negligence and products liability, Piper, if it remains in existence, would be liable for some of these damages. Even so, there is no way to identify who the victims will be or to identify any particular prepetition contact, exposure, impact, privity or other relationship between Piper and these potential claimants that will give rise to these future damages.

*Id.* at 627.

The court also recognized that defining "claim" to include *any* ultimate right to payment arising out of pre-petition conduct would yield questionable results. *Id.* at 626. The court found particularly enlightening the Second Circuit's hypothetical that addressed this very issue, *id.* at 626-27, which follows:

> Defining claims to include any ultimate right to payment arising from pre-petition conduct by the debtor comports with the theoretical model of assuring that all assets of the debtor are available to those seeking recovery for pre-petition conduct. But such an interpretation of "claim" yields questionable results. Consider, for example, a company that builds bridges around the world. It can estimate that of 10,000 bridges it builds, one will fail, causing 10 deaths. Having built 10,000 bridges, it becomes insolvent and files a petition in bankruptcy. Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail someday in the future? If the only test is whether the ultimate right to payment will arise out of the debtor's pre-petition conduct, the future victims have a "claim." Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim. The potential victims are not only unidentified, but there is no way to determine them. Sheer fortuity will determine who will be on that one bridge when it crashes. What notice is to be given to these potential "claimants"?

*United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir.1991). The *Piper*

court thus recognized that "significant and possibly insurmountable due process problems" existed in providing future claimants with constitutionally sufficient notice of Piper's bankruptcy proceedings to discharge their claims. *Piper,* 162 B.R. at 628; *cf. Waterman,* 157 B.R. at 222 (concluding that although a "claim" arose in bankruptcy at the moment a claimant was exposed to asbestos, potential future claims of individuals who had not manifested any detectable signs of disease when notice of the bar date was given were not dischargeable in the reorganization proceedings).

Accordingly, the court then determined that "there must be some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant" in order for a future claimant to have a "claim" under the Code. *Piper,* 162 B.R. at 627; *see also In re Jensen,* 995 F.2d 925, 930-31 (9th Cir.1993) (concluding that for a "claim" to arise under the Code, not only must a pre-petition relationship between the claimant and the debtor exist but also the "claim" must have been within the "fair contemplation of the parties" at the time of bankruptcy); *Chateaugay,* 944 F.2d at 1005 (finding that "[t]he relationship between environmental regulating agencies and those subject to regulation provides sufficient "contemplation" of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims"); *In re National Gypsum,* 139 B.R. 397, 409 (N.D.Tex.1992) (determining that although a "claim" could arise in bankruptcy under the Code even though the cause of action on which the claim was based was not yet ripe for adjudication under relevant substantive law, the pre-petition conduct of the debtor must be such that the parties could "fairly contemplate" a problem in the future). Because the court found no such pre-petition relationship between the future claimants and Piper, the court disallowed the claim filed by the future claimants' legal representative. *Id.* 162 B.R. at 629.

We turn now to the instant case. The injury suffered, i.e., the death of the decedents, occurred simultaneously with the manifestation of that injury in December 1985, years after Winston's reorganization plan had been confirmed. The design and manufacture of the mobile home in question thus resulted in *no* tortious consequence until a fire started in that mobile home in December 1985. Further, there is no evidence in the record to indicate when Forbes and her family acquired this mobile

home or from whom they acquired it. There is no evidence to establish that Winston, as the manufacturer of the mobile home in question, should have even known of Forbes' and her family's existence.

Where, as here, the injury and the manifestation of that injury occurred simultaneously—more than three years after Winston filed its petition and more than two years after the plan was confirmed, we think that, at a minimum, there must be evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby to permit notice to these potential victims of the pendency of the proceedings. *See Chateaugay,* 944 F.2d at 1003; *Piper,* 162 B.R. at 628. This record is devoid of any evidence of any pre-petition contact, privity, or other relationship between Winston, on the one hand, and Forbes or the decedents, on the other. We think the absence of this evidence precludes a finding by the district court that the claims asserted by Forbes were discharged in Winston's bankruptcy proceedings. *See Chauteaugay,* 944 F.2d at 1005; *Piper,* 162 B.R. at 627; *Gypsum,* 139 B.R. at 409.

Our decision is not inconsistent with the broad definition of "claim" suggested by the statutory language and legislative history of § 101(5) of the Code. In our view, however, even the broad definition of "claim" cannot be extended to include Forbes or the decedents as claimants whom the record indicates were completely unknown and unidentified at the time Winston filed its petition and whose rights depended entirely on the fortuity of future occurrences. We do not here decide whether if evidence of some pre-petition relationship between Winston and Forbes or the decedents had been adduced, we might nonetheless conclude that neither Forbes nor the decedents had a "claim" or that any such claim had not been discharged in bankruptcy. We need not reach that question on this record. We merely conclude that under the specific facts of this case, the district court erred in determining that because Winston had been discharged from all obligations and demands when Winston's reorganization plan was confirmed, Universal—as a successor corporation—could not be potentially liable on Forbes' tort claim. Summary judgment for Universal was therefore improper.

C. *USF & G*

USF & G, as the alleged insurer of Werts and Universal, moved for summary judgment

against Forbes, asserting that inasmuch as Werts/Universal had been granted summary judgment, there could be no damages to Forbes for which USF & G was legally obligated to pay. The district court granted USF & G's motion on February 8, 1988.

USF & G had issued a comprehensive general liability insurance policy to Werts for the policy period of October 1, 1985, to October 1, 1986, in renewal of an earlier policy. Throughout the policy period in question, Winston was a subsidiary of Werts. On September 25, 1985, when Winston was merged into Universal Chicken Farms, a wholly-owned subsidiary of Werts, Werts owned all of the issued and outstanding shares of capital stock of Winston. On November 25, 1985, the survivor of the Winston-Universal Chicken Farms merger, Winston II, merged with Universal, another subsidiary of Werts. Because we have already determined that Universal is potentially liable to Forbes on her claim, whether USF & G remains in this law suit as the insurer of Werts/Universal depends upon the contents of the policy USF & G wrote for Werts that went into effect on October 1, 1985. Hence, the district court erred in granting summary judgment to USF & G.

IV.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.