# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40597

United States Court of Appeals
Fifth Circuit

**FILED**

April 16, 2015

Lyle W. Cayce
Clerk

In the Matter of:  MARCO A. CANTU, ROXANNE CANTU

Debtors

------------------------------

MARCO A. CANTU; ROXANNE CANTU,

> Appellants

v.

MICHAEL B. SCHMIDT, Trustee,

> Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before BENAVIDES, SOUTHWICK, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

In bankruptcy, as in life, timing can be everything.  After their bankruptcy was converted from a chapter 11 reorganization to a chapter 7 liquidation, Marco and Roxanne Cantu sued their bankruptcy attorney Ellen Stone for causes of action related to her representation prior to the conversion of their case.  The chapter 7 trustee, Michael Schmidt, intervened in the action against Stone contending that the claims belonged to the estate. The parties

No. 14-40597

eventually settled the malpractice case and the funds were deposited into the court registry pending a determination whether the settlement proceeds belonged to the Cantus individually or to the bankruptcy estate.

The resolution of that question depends on timing. If the causes of action against Stone arose before conversion of the Cantus' bankruptcy to a chapter 7, the settlement belongs to the estate; otherwise, the Cantus own the proceeds. The bankruptcy court held that the proceeds belonged to the estate, and the district court affirmed. Finding that the estate suffered injuries from Stone's representation that would have allowed it to assert claims against her prior to conversion, we affirm.

## I.

We begin with an overview of the bankruptcy proceedings. In May 2008, facing foreclosure on a number of real estate holdings, Marco and Roxanne Cantu filed a chapter 11 bankruptcy petition as did their wholly owned corporation, Mar-Rox, Inc. **ROA.190;** *Schmidt v. Cantu (In re Cantu)*, 2011 WL 672336, at *1 (Bankr. S.D. Tex. Feb. 17, 2011). At the time of filing, the Cantus had personally taken on over $37.4 million in secured debt and over $10.7 million in unsecured debt. Mar-Rox had incurred over $20.9 million in secured debt. *Id.* These debts had been used to obtain personal property such as four vehicles, furs, and jewelry; purchase over $20 million in commercial and residential real estate (some owned by Mar-Rox, Inc.); and finance the Cantus' business interests including Mr. Cantu's law practice. *Id.*

About a month into the bankruptcy, the Cantus hired Ellen Stone. **ROA.191.** She represented the Cantus and Mar-Rox from June 2008 until July 2009, during which time she charged $202,915.06 for legal services and

2

No. 14-40597

expenses that the bankruptcy court ultimately approved. *In re Cantu*, No. 08-70260 (Bankr. S.D. Tex.), Docket Entry Nos. 1098, 1274.[1]

The bankruptcy was complex. It resulted in numerous adversarial proceedings, many of which involved the Cantus challenging the validity of their creditors' claims; dozens of hearings; objections and subsequent amendments to the disclosure statement and the reorganization plan; and thousands of docket entries.

In December 2008, a number of creditors moved to convert the bankruptcy to a chapter 7 liquidation, pointing to the decreasing value of the Cantus' assets and unlikelihood that the Cantus would "be able to stem the losses and place themselves back on a solid financial footing within a reasonable amount of time." *Cantu Bankruptcy*, Docket Entry No. 548. After much briefing and multiple hearings, the bankruptcy court agreed. Finding that the plan of reorganization was not confirmable, in part because it violated the absolute priority rule,[2] the court converted the case to a chapter 7 bankruptcy and appointed Schmidt as trustee. *Cantu Bankruptcy*, Docket Entry No. 1034.

Once the case was converted, the bankruptcy court held a two-day trial on the issue of discharge and determined that the Cantus should not be allowed to discharge their debts. In its exhaustive opinion, the court detailed the

---

[1] Entries from the Cantus' bankruptcy, *In re Cantu*, No. 08-70260 (Bankr. S.D. Tex. filed May 6, 2008), are referred to as "*Cantu Bankruptcy*" followed by the relevant docket entry number.

[2] "A plan of reorganization may not allocate any property whatsoever to any junior class on account of the members' interest or claim in a debtor unless all senior classes consent, or unless such senior classes receive property equal in value to the full amount of their allowed claims, or the debtor's reorganization value, whichever is less." 11 COLLIER ON BANKRUPTCY ¶ 1129.03[4][a][i] (16th ed.); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) ("[T]he absolute priority rule 'provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'").

No. 14-40597

"omissions, misstatements, and controversies" that plagued the Cantu and Mar-Rox bankruptcies. *See In re Cantu*, 2011 WL 672336, at *2. The court highlighted the Cantus' failure to disclose "significant assets and transactions," including $134,575 in jewelry sales, two of Mr. Cantu's contingency fee cases, and two life-sized bronze horses worth $20,000. *Id.* Mr. Cantu also improperly transferred $50,000 of what should have been estate property to a close friend during the pendency of the bankruptcies. *Id.* In addition to "suspicious and frequently undocumented" use of estate cash throughout the bankruptcies, the Cantus were also "uncooperative with the Court and the Trustee," and Mr. Cantu often interfered with the sale of the estate's assets and filed frivolous lawsuits that "unnecessarily multiplied the proceedings in the [bankruptcies] and therefore unreasonably increased the Estate's cost of administration." *Id.* at *16.[3]

In November 2011, the Cantus obtained new counsel to investigate potential malpractice claims against Stone and her firm. *Cantu Bankruptcy*, Docket Entry No. 2369-1. The trustee notified the Cantus' new attorney that he believed the claims against Stone were "property of the estate and under [the trustee's] sole authority" to prosecute. **ROA.74**. The bankruptcy court authorized the trustee to investigate and pursue claims against Stone, though it did not rule on whether the property belonged to the estate. **ROA.76**.

A lawsuit was then filed in state court against Stone asserting the following claims: (1) legal malpractice, in part for failing to file a plan of reorganization that satisfied the disposable income and the absolute priority rules; (2) vicarious liability for the negligence of the associate who worked on

---

[3] After denying the Cantus discharge based on their misrepresentations and omissions in the bankruptcy case, the bankruptcy court sent its opinion discussing Mr. Cantu's conduct to the State Bar of Texas and the United States District Court for the Southern District of Texas. *See In re Cantu*, 2011 WL 672336, at *5 n.19.

No. 14-40597

the Cantus' case; (3) violations of the Texas Deceptive Trade Practices Act; (4) gross negligence for accepting the Cantus' complex bankruptcy case despite an alleged lack of experience; and (5) fraudulent misrepresentation and inducement based on statements Stone made regarding her experience in chapter 11 bankruptcies. **ROA.79–87**. "Fee forfeiture and reimbursement" was among the relief requested. **ROA.87.**

Stone removed the case to federal court, where it survived a remand motion. **ROA.192**. The parties eventually settled for $281,710.54, which was deposited into the court registry pending a determination whether the settlement proceeds belonged to the Cantus or the bankruptcy estate. **ROA.192; ROA.96.** The district court referred the case to the bankruptcy court to make that initial determination. **ROA.193**.

That brings us to the rulings that are the subject of this appeal. The trustee moved for summary judgment in the bankruptcy court, arguing that the settlement proceeds were property of the estate. **ROA.193.** The district court had earlier indicated in its denial of the Cantus' Motion to Remand that the proceeds belonged to the bankruptcy estate.[4] **ROA.89–94.** The bankruptcy court agreed that under either of two different approaches used to determine ownership—the "middle ground" or "prepetition relationship" approach, which the district court had applied in its remand ruling, and the "accrual approach"—the settlement proceeds belonged to the estate. **ROA.203.** The Cantus sought review of the bankruptcy court's decision in the district court, **ROA.219**, which affirmed the grant of summary judgment. **ROA.324.** The Cantus timely appealed.

---

[4] The district court found removal was proper under 28 U.S.C. § 1334 because the claims arose prior to conversion and were therefore owned by the bankruptcy estate. If we were to find instead that the claims belonged to the Cantus individually, we would have to reconsider that jurisdictional ruling.

5

No. 14-40597

## II.

The property of a chapter 11 bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[5]  11 U.S.C. § 541(a)(1).  A 2005 amendment to the Bankruptcy Code expanded that definition for individual chapter 11 debtors to encompass "all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is . . . converted to a case under Chapter 7."  11 U.S.C § 1115(a)(1).  Causes of action that belong to the debtor "at the time the case is commenced" or that are acquired after commencement but before conversion are therefore property belonging to the estate.  *See Yaquinto v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 223–24 (5th Cir. 2001); *Torch Liquidating Trust v. Stockstill*, 561 F.3d 377, 386 (5th Cir. 2009); 11 U.S.C. § 1115.  But if a cause of action is acquired at or after the time of conversion, it belongs to the individual debtor.

How do we determine when a cause of action arises?  The question seems to answer itself: it is a matter of accrual.  That is the approach we took in *State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 795 (5th Cir. 1997), holding that the determining factor was when "Swift's causes of action had accrued" under state law.  As is often the case under tort law, wrongful conduct alone was not sufficient for accrual of the negligence and fiduciary duty claims in *Swift*, as "some form of legal injury must [have] occur[ed] before these causes of action accrue[d]."  *Id.*  Other circuits follow this accrual approach.  *See, e.g.*, *O'Dowd v. Trueger (In re O'Dowd)*, 233 F.3d 197, 203 (3d Cir. 2000) (relying on New Jersey law to determine that "a legal-malpractice action accrues when an attorney's breach of professional duty proximately causes a plaintiff's damages"); *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Alvarez (In*

---

[5] The statute exempts certain property not relevant here.

No. 14-40597

*re Alvarez)*, 224 F.3d 1273, 1276–77 (11th Cir. 2000) (applying Florida law to determine that a malpractice cause of action accrued against debtor's bankruptcy attorney who filed a chapter 7 bankruptcy instead of a chapter 11 bankruptcy the moment of the chapter 7 filing, and therefore belonged to the estate). But as the court below took two different paths to resolving this issue, this case presents an opportunity to clarify that the "accrual approach" is the appropriate one to use when determining whether a cause of action is property belonging to the estate or the debtor individually.

The confusion that has seeped into this timing issue stems from *Wheeler v. Magdovitz (In re Wheeler)*, 137 F.3d 299 (5th Cir. 1998) (per curiam). That decision, coming just a year after *Swift*, applied the accrual approach to find that a legal malpractice claim arose prior to the filing of the bankruptcy petition and thus belonged to the estate. *See id.* at 301. But it also analyzed the timing question according to a different test: the "middle ground" or "prepetition relationship" approach in which "a claim arises at the time of the negligent conduct forming the basis for liability," even if no injury has yet occurred, so long as a prepetition relationship between debtor and claimant existed. *Id.* at 300–01 (citing *In re Piper Aircraft Corp.*, 162 B.R. 619 (Bankr. S.D. Fla. 1994), and *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268 (5th Cir. 1994)). Although applied in *Wheeler* to determine whether a cause of action belonged to the estate or the debtor individually based on the timing of the claim, this test arose in the context of personal injury claims asserted against companies that had previously been in bankruptcy. It addresses whether a third-party plaintiff can bring a tort claim against a reorganized company or whether that claim was discharged in the company's earlier bankruptcy. *See Lemelle*, 18 F.3d at 1277–78 (products liability for mobile home); *Piper*, 162 B.R. at 627–28 (plane crash). In *Lemelle*, for example, the defendant company argued that the plaintiff's product liability claim was a discharged debt that

7

No. 14-40597

should be dismissed, even though the injury did not occur until years after the bankruptcy. 18 F.3d at 1277–78.

To answer this timing question for claims asserted against a debtor, courts have taken three different approaches. Some look to when the negligent conduct occurred (thus labelled the "conduct test"), which is typically prior to or during the bankruptcy and thus results in the claim being discharged. *See, e.g., Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010); *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 199, 203 (4th Cir. 1988). Others use an accrual test that would typically allow the lawsuit to go forward when the plaintiff's injury does not occur until after the bankruptcy because the tort claim does not accrue until the injury is manifested. *See, e.g., Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.3d 332, 337 (3d Cir. 1984), *overruled by In re Grossman's*, 607 F.3d at 121. An attempt to find a position between these two, thus its "middle ground" moniker, the "prepetition relationship" test uses the conduct test only if there is "evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby permit notice to these potential victims of the pendency of the proceedings." *Lemelle*, 18 F.3d at 1277; *Placid Oil Co. v. Williams (In re Placid Oil Co.)*, 463 B.R. 803, 813–14 (Bankr. N.D. Tex. 2012) (applying middle ground approach to determine that plaintiffs filing asbestos claims against reorganized company had prepetition relationship with defendant warranting discharge). Absent such evidence of notice, potential claimants might be denied due process if their later-arising claims were discharged in an earlier bankruptcy they knew nothing about. *See Lemelle*, 18 F.3d at 1277.

As should be apparent by now, this line of cases assessing whether a tort claim *asserted against* a reorganized debtor is a dischargeable one that arose prepetition is quite different from the situation we face concerning the timing

8

of a claim *asserted by* the debtor. The former situation turns on the scope of a "claim" subject to discharge, a term defined in section 101(5)(A) of the Bankruptcy Code as a "right to payment" from a debtor, not the definitions of property belonging to the estate set out in sections 541 and 1115. A bankruptcy court explained this key distinction in declining to apply the section 101(5) "claim" analysis to the question whether a cause of action is property belonging to the estate: "the fundamental decisional issue behind the definition of 'claim' is decisively different from the decisional issue that drives the definition of 'property of the estate,'" because the definition of "claim" must be broad enough to "protect the debtor's potential 'fresh start,'" but it is unnecessary that "any and all *assets* arising from pre-petition conduct be includable in the estate in order to protect the debtor's 'fresh start.'" *Swift v. Seidler (In re Swift)*, 198 B.R. 927, 935–36 (Bankr. W.D. Tex. 1996) (emphasis in original).[6] And concerns about the notice provided to potential personal-injury plaintiffs who did not yet file a claim, which gave rise to the focus on a "prepetition relationship," do not translate to this situation in which the debtor is the plaintiff seeking to bring a claim.

We thus clarify that the "prepetition relationship" or "middle ground" test, which we first adopted in *Lemelle* to address whether a claim asserted against a restructured company had been discharged, does not apply to determining whether a claim that a debtor seeks to assert constitutes property of the estate. Although *Wheeler* applied the *Lemelle* test in this latter situation, that reasoning was not essential as *Wheeler* also applied the accrual test to reach the same result. *See Wheeler*, 137 F.3d at 301 (concluding that Mississippi law dictated that the debtor's malpractice claim against his

---

[6] This is the companion case for attorney malpractice to *In re Swift*, 129 F.3d at 792, in which the debtor brought suit against the administrator of his retirement plan.

attorney accrued prepetition).    Moreover, to the extent *Swift* and *Wheeler* cannot be reconciled, *Swift*—which is consistent with the law in other circuits—is the earlier decision and thus governs under our rule of orderliness.[7]  *See E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014). And *Swift*'s accrual approach ensures a focus on whether the alleged wrongful conduct harmed the estate, in which case any recovery should benefit the estate under the broad command that property of the estate includes "all legal or equitable interests of the debtor in property."  *See* 11 U.S.C. § 541(a)(1); *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008) (holding that section 541(a)(1) should be construed "broadly").

### III.

We now turn to the more difficult task in this case: applying the accrual approach.  "The accrual of a cause of action means the right to institute and maintain a suit, and whenever one person may sue another a cause of action has accrued."  *In re Swift*, 129 F.3d at 795 (quoting *Luling Oil & Gas Co. v. Humble Oil & Refining Co.*, 191 S.W.2d 716, 721 (Tex. 1946)); *see also Apex Towing Co. v. Tolin*, 41 S.W.3d 118 (Tex. 2001) (explaining that a claim accrues "when facts have come into existence that authorize a claimant to seek a judicial remedy").

The parties agree that Stone's misconduct in handling the bankruptcy occurred preconversion.  As Judge Wisdom explained in *Swift*, however, under state law most causes of action do not accrue until the wrongful act caused an injury.  129 F.3d at 795 ("[S]ome form of legal injury must occur before these

---

[7] *Wheeler* did not even cite *Swift*, applying the accrual test only because that test has also been used by some courts to answer the section 101(5) question of when a "claim" against a bankruptcy estate includes a claim for unaccrued tort liability.  *See Wheeler*, 137 F.3d at 300.

No. 14-40597

causes of action accrue."). The Cantus argue that in this case that necessary injury occurred only after conversion when their assets were liquidated and the bankruptcy court denied them discharge. The trustee acknowledges that this injured the Cantus as they are still liable for their debts. But he contends that the estate also suffered injuries from Stone's misconduct, and those injuries arose earlier, prior to the conversion. If that is the case, then the settlement funds belong to the estate. *See* 11 U.S.C. § 1115(a)(1). That is true even if a preconversion injury to the estate did not encompass the full settlement amount; "as a rule . . . a cause of action accrues when a wrongful act causes *some* legal injury, even if the fact of injury is not discovered until later, and e*ven if all resulting damages have not yet occurred.*" *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex. 1997) (emphasis added) (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 4 (1996)); *see also In re Swift*, 129 F.3d at 795–96 ("But, it is not necessary to know immediately the type and extent of [the] injury. All that is needed is a specific and concrete risk of harm to the party's interest." (citation omitted)).

Determining whether the estate suffered a preconversion injury that would have allowed it to file suit against Stone is not as simple to discern as it has been in previous cases in which the cause of action focused on a discrete act of tortious conduct. In *Swift*, for example, that single event was the conversion of a Keogh plan to an IRA, which caused the plaintiff to lose a tax advantage and a bankruptcy exemption. 129 F.3d at 799. The Cantus' allegations cast a much wider net, asserting the various malpractice- and fraud-based claims listed above, and the settlement agreement is not attributable to a specific one. As for the conduct that gave rise to these causes of action, the Cantus alleged that Stone failed to timely request permission for use of cash collateral, failed to schedule certain transfers of assets, employed an incompetent associate, failed to inform one of the Cantus' witnesses when

11

he would testify, failed to prepare the expert, and failed to file a confirmable plan of reorganization. **ROA.79–87.** They further contended that Stone misrepresented her experience in complex bankruptcy cases. **ROA.79–87.** The bankruptcy court agreed with these allegations, finding systemic malpractice in concluding that Stone's conduct was "so egregious and so outside the bounds of acceptable, professional conduct of a fiduciary that (at some point well before the conversion) the acts created 'a specific and concrete risk of harm' to the Cantus' interests sufficient to constitute legally cognizable injury." ROA 20 (quoting *Swift*, 129 F.3d at 795–96).

In reviewing that accrual determination, we focus on whether the allegations and causes of action in the Cantus' petition injured the estate in a manner that would have enabled the trustee to file the lawsuit prior to conversion. We conclude that Stone's misconduct injured the creditor body in a number of ways during the pendency of the chapter 11 bankruptcy that would have allowed the estate to file suit prior to conversion.

For starters, Stone's misconduct led to the depletion of assets that could have otherwise gone to pay creditors. The Cantus alleged that Stone failed to timely file a request for use of cash collateral, which led to their "unauthorized use of cash collateral." ROA 82; *see* 11 U.S.C. 363; FED. R. BANKR. P. 4001(b) (requiring debtor to file motion for use of cash collateral). The Cantus contend this ended up harming them because the lack of authorization was one of the grounds cited for conversion. *See In re Cantu*, 2011 WL 672336, at *5; 11 U.S.C. § 1112(b)(4)(D) (listing reasons that a bankruptcy court may convert a case to chapter 7 for cause). Of course, a more direct consequence of their unapproved use of cash for personal expenses was the depletion of assets that

12

could have been used to pay creditors.[8]  Diversion of property otherwise available to the estate was also a consequence of Stone's failure to schedule assets like the jewelry the Cantus sold, contingency fees obtained in lawsuits Mr. Cantu handled, and property they gratuitously transferred to a friend.  *See In re Cantu*, 2011 WL 672336, at *2, *10.  In addition, transferring assets away from the estate made it more difficult to confirm a plan of reorganization, which requires a sufficient corpus of cash to make necessary payments upon confirmation.  *See* WILLIAM L. NORTON III & ROGER G. JONES, NORTON CREDITORS' RIGHTS HANDBOOK § 18:19 (2014 ed.) (explaining that "[c]onfirmation of a plan of reorganization is costly," and cash is required to pay costs of administration, to cover reinstated loans and leases, and to make "payments to prepetition creditors shortly after confirmation").

This brings us to a more fundamental point.  Submitting an unconfirmable plan, which was the culmination of Stone's misconduct, did not just hurt the Cantus personally because it led to conversion and an eventual ruling against discharge.  It also harmed the estate.  A reorganization plan must either be accepted by each creditor or satisfy the Code's "best interests of the creditor" rule, which requires that the holder of a claim receive under the reorganization plan at least as much as the holder would receive in the event of chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7)(A); *see also* 11 COLLIER, *supra* note 2, ¶ 1129.02[7] (providing that the "best interests of creditors" rule "is one of the cornerstones of chapter 11 practice").  Although creditors being

---

[8] The cash used without authorization was more than mere pocket change.  A bank that had a lien on rental property owned by the Cantus filed an administrative claim for $155,628.39, contending the Cantus had spent money without court approval.  *In re Cantu*, 2011 WL 672336, at *18.  The unauthorized use of cash continued.  In its order denying the Cantus discharge from their chapter 7 bankruptcy, the bankruptcy court found that the Cantus continued to use cash income from some of their properties after the authorization for use of cash collateral expired.  *Id.* at *18.

"at least as well off" is the statutory requirement for plan confirmation, ordinarily creditors are better off when the debtor is reorganized into a going concern than when a liquidation occurs. *See Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1442 (6th Cir. 1995) (explaining that the purpose of chapter 11 is to allow debtors the opportunity to reorganize, "and thereby to provide creditors with going-concern value rather than the possibility of a more meager satisfaction through liquidation"); RICHARD I. AARON, 1 BANKRUPTCY LAW FUNDAMENTALS § 1:4 (2014 ed.) ("The premise of Chapter 11 rests upon an obvious business truth.  An ongoing business commands a greater going concern value than the piecemeal liquidation through the sale of its component parts . . . often called the going concern bonus." (citation omitted)).  And to the extent Stone should have never filed the case as a chapter 11 bankruptcy in the first place, something the bankruptcy court suggested may have been the case,[9] the delay and cost resulting from the more than 12 month effort to create a plan of reorganization harmed the estate.  *See* Elizabeth Warren & Jay L. Westbrook, *The Success of Chapter 11: A Challenge to the Critics*, 107 MICH. L. REV. 603, 625 (2009) ("[F]ees and other expenses associated with a Chapter 11 case diminish the value available to creditors, a consequence that is felt most sharply if the reorganization fails and liquidation follows.  In addition, the time spent in bankruptcy itself leads to the loss of value.").

This mention of the expenses associated with the chapter 11 process brings us to the final reason why the estate had an injury that would have permitted suit against Stone prior to conversion.  The bankruptcy court

---

[9] The bankruptcy court explained that the case "was resting on the cusp of conversion to chapter 7, [and] was not converted to 7 originally, primarily because the Debtor was able to compromise and settle with the majority of the creditors in this case." *Cantu Bankruptcy*, Docket Entry No. 1212.

No. 14-40597

approved $202,915.06 in attorneys' fees and expenses for Stone's representation, almost all of which related to chapter 11 work as she was terminated soon after conversion and much of which was paid prior to conversion. *Cantu Bankruptcy*, Docket Entry No. 1274. The fraudulent inducement claim alleging that Stone misrepresented her qualifications thus resulted in injury to the estate through the payment of these fees, and the estate could have asserted a preconversion claim seeking to recover them. *See Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 238–39, 10 (Tex. 1957) ("[I]t is well settled that one who is induced by fraud to enter into a contract . . . may . . . rescind the contract, and . . . receive back what he paid.").

The Cantus' primary argument in response to any preconversion injury the estate may have suffered is that the injury was still correctable prior to conversion. For example, they point out that even if the deficient confirmation plan Stone submitted injured the estate, she could have submitted a second, better plan that would have remedied any injury. This ignores that she did not try to correct her errors. In any event, we see two problems with this reasoning. First, some of the injury suffered by the estate—at least the depleted assets and unnecessary attorneys' fees and costs—likely could not be undone. Second, and more basic, a claim accrues when an injury occurs; that injury need not be an irrevocable one. Consider a simple breach of contract claim in which delayed, even post-lawsuit, performance might mitigate or eliminate damages. One would not say there is no claim for breach just because the defendant could still fix the problem. The possibility that Stone's later conduct could have minimized harm to the estate thus does not undermine our conclusion that the estate had suffered sufficient preconversion injury to permit a lawsuit.

15

No. 14-40597

\* \* \*

For these reasons, we conclude that the widespread misconduct alleged against Stone resulted in numerous injuries to the creditor body during the pendency of the Chapter 11 case.  The causes of action against Stone therefore accrued prior to conversion and belong to the estate.  The district court is AFFIRMED.