**REVISED, JULY 25, 2000**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

m 99-10758
_____

IN THE MATTER OF:

NATIONAL GYPSUM COMPANY,
AND
AANCOR HOLDINGS, INC.,

Debtors.

THE NEW NATIONAL GYPSUM COMPANY,

Appellant,

VERSUS

THE NATIONAL GYPSUM COMPANY SETTLEMENT TRUST,

Appellee.

* * * * * * * * * * * * * *

IN THE MATTER OF:

NATIONAL GYPSUM COMPANY,

Debtor.

NATIONAL GYPSUM COMPANY,

Appellant,

VERSUS

NGC SETTLEMENT TRUST
AND
THE ASBESTOS CLAIMS MANAGEMENT CORPORATION,

Appellees.

Appeals from the United States District Court
for the Northern District of Texas

July 18, 2000

Before REAVLEY, SMITH, and
EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In 1993, the bankruptcy court entered an order (the "Confirmation Order") confirming the joint chapter 11 plan of reorganization (the "Plan") of Aancor Holdings, Inc. ("Aancor"), and its wholly-owned subsidiary, National Gypsum Company ("Old-NGC"), and approving certain plan documents. As a result of the bankruptcy reorganization, National Gypsum Company ("New-NGC") was created as a new Delaware corporation. Four years later, the NGC Settlement Trust (the "Trust") and its

subsidiary, formerly Old-NGC and now called Asbestos Claims Management Corporation ("ACMC"), filed this declaratory judgment action in bankruptcy court, seeking a determination that, under the Plan, New-NGC was liable for any unknown asbestos disease claims (the "Unknown Claims") arising from Old-NGC's torts and not resolved by the Trust.

Following an adversary hearing, the bankruptcy court delivered a bench ruling in which it concluded that under the Plan, New-NGC was liable for Unknown Claims the Trust could not satisfy. New-NGC appealed to the district court, which affirmed. Concluding that the Confirmation Order and other plan documents do not transfer liability for these Unknown Claims from Old-NGC to New-NGC, we reverse and remand.

I.

In October 1990, Old-NGC and Aancor filed petitions, later consolidated, for relief under chapter 11 of the Bankruptcy Code. Old-NGC faced two key groups of creditors: Unsecured bond and trade creditors that were owed approximately $1.1 billion, and asbestos-related claimants who had an estimated $127 million due for pending claims and projected future disease claims of $695 million to $764 million.

The bankruptcy court appointed committees to represent the holders of the unsecured bond and trade claims (the "BT Committee") and the asbestos claims (the "Asbestos Committee") and a legal representative to represent holders of Unknown Claims. After selling some of its assets, Old-NGC retained two of its subsidiary businesses: the Gold Bond Building Products division ("Gold Bond"), which produces and sells gypsum and wallboard-related products, and the Austin Company ("Austin"), a design, engineering, and construction firm. Old-NGC also retained insurance coverage ("Insurance") available to pay some asbestos claims.

Old-NGC, the Asbestos Committee, and the BT Committee agreed on how Old-NGC's assets would be used to pay commercial and asbestos claims. Commercial creditors would receive Gold Bond, and asbestos claimants would receive Old-NGC and its assets, including Austin, the Insurance, certain insurance-related claims, and $10 million from New-NGC. Under a draft plan of reorganization (the "Draft Plan"), Aancor, the parent debtor, would be merged into Old-NGC, with Old-NGC as the surviving entity. Old-NGC was to be renamed Asbestos Claims Management Corporation, and two new entities were to be created, the Trust and New-NGC. The Draft Plan was approved by the necessary classes of commercial creditors and both classes of asbestos creditors.

Under the Draft Plan, New-NGC, a new Delaware corporation, would purchase from Old-NGC the operating assets and business of Gold Bond, including the name "National Gypsum Company." The commercial creditors then would look to New-NGC, while the asbestos claimants would look to the Trust.

Because under the Draft Plan the commercial creditors would own New-NGC, worth approximately $350 million, and because they had, in return, agreed to extinguish over $1 billion in claims against Old-NGC, the commercial creditors also requested a permanent injunction, in the Confirmation Order, protecting New-NGC from future and Unknown Claims, to maximize the value of New-NGC's securities in the public markets by removing any taint from the possibility of

asbestos-related liability. Thus, the Draft Plan provided not only that the Trust would be established and would assume sole responsibility for all asbestos claims, including Unknown Claims, but also that the Confirmation Order would contain a "channeling order and permanent injunction" that would channel all asbestos claims to the Trust and forever would bar the assertion of any asbestos claims against New-NGC.

The Draft Plan also provided for the formation of the Trust, which would retain Austin (valued at approximately $125 million), the Insurance (worth between $300 million and $600 million, depending on how pending coverage litigation was resolved), certain other insurance-related claims, and a $10 million cash payment from New-NGC. As a result, the Draft Plan made it likely, but not a certainty, that the Trust assets would be sufficient to pay all present and future asbestos diseases claims, particularly if the settlement in the related litigation in *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d Cir. 1996), were approved.

This payment-in-full was to be accomplished through a joint defense facility, the Center for Claims Resolution ("CCR"), established in 1988 by Old-NGC and nineteen other former asbestos companies. CCR set up an administrative compensation system that, in most cases, would replace judicial resolution of asbestos claims; this facility was subject to approval in the *Georgine* settlement.[1] Regardless of the level of funding that ultimately would be available for these claims, however,

the Trust was required to give all claims, whether current or unknown, "substantially equivalent" treatment.

If the then-pending *Georgine* settlement were not approved, the Draft Plan included a back-up option that required the Trust to implement the "Alternate Asbestos Disease Claims Resolution Facility" (the "Alternate Facility"), which would provide for the ratable distribution of Trust assets to all projected asbestos claimants. A claimant would receive a percentage of the liquidated value of his claim, calculated by dividing the value of Trust assets by the projected amount of all future liabilities. The Alternate Facility was designed, therefore, to preserve "sufficient resources to pay future valid [asbestos claims] on a substantially equivalent basis."

The Draft Plan was submitted to the bankruptcy court for approval. The legal representative of the Unknown Claimants opposed the provision for a permanent injunction, fearing that New-NGC would not assume even non-asbestos-related claims arising post-petition and that, as a result, those obligations might have to be born by Old-NGC or the Trust.

Following hearings on asbestos issues in January 1993, the bankruptcy court decided that it lacked jurisdiction to enjoin permanently or to discharge Unknown Claims. It reasoned that persons who had not yet suffered an injury that was cognizable under applicable non-bankruptcy law did not hold "claims" within the meaning of section 101(5) of the Bankruptcy Code. The court also concluded, however, that it did have the power to enter a temporary injunction that would require Unknown Claims first to be exhausted from the Trust before the claimants asserting them could pursue remedies against any other person, including

---

[1] *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 599-605 (1997) (describing the CCR's system for settling and compensating asbestos-related claims).

New-NGC.

Because they were uncertain how to re-draft the injunctive language, the parties in February 1993 addressed to the bankruptcy court the issue of the temporary injunction and New-NGC's potential liability for any Unknown Claims. The court, however, was unwilling to take a position on whether New-NGC would be liable in the future for the Unknown Claims, noting that this liability should be decided according to non-bankruptcy law and that New-NGC could defend any future suits by claiming that it was not a successor to the debtors' liabilities.

As a consequence of the January 1993 decision and the February 1993 hearing, the Draft Plan was modified to eliminate the permanent injunction against Unknown Claims, though that injunction would be in effect against current asbestos claims. In March 1993, Old-NGC proposed the Third Technical Modifications to the Plan, which changed the Draft Plan (1) by drawing a distinction between current claims and Unknown Claims to exclude Unknown Claims from the discharge and (2) by removing the permanent injunction against Unknown Claims and replacing it with the more limited "Channeling Order and Injunction."

The BT Committee objected, arguing that this was a substantial change from the Draft Plan that would permit the Unknown Claims to be litigated against New-NGC after remedies against the Trust had been exhausted. The bankruptcy court rejected this objection, however, and approved the Third Technical Modifications, reasoning that the changes to the Draft Plan did "not adversely change the treatment under the Plan of any [creditor]."

As approved, then, the Plan provided, in pertinent part, that current asbestos claimants were permanently enjoined from ever suing any person other than the Trust, including New-NGC. Unknown Claimants were neither discharged nor permanently enjoined but were "made beneficiaries of the [Trust] and, pending exhaustion of the remedies of the [Trust] to resolve Unknown Claims, are enjoined" from pursuing litigation against any person, including New-NGC. This temporary injunction is referred to throughout the Plan, Confirmation Order, and briefs as the "Channeling Order."

The modifications to the Plan did not alter the previous Draft Plan's section that provided that New-NGC would not assume asbestos liabilities of Old-NGC: "Upon consummation of the Merger and this Plan, New-NGC shall perform all of the obligations of the Debtors under this Plan (except for the obligations regarding the Asbestos Claims which shall be the sole responsibility of the [Trust])." "Asbestos Claims" were defined to include both current and Unknown Claims. Likewise, the Confirmation Order included a detailed description of the Channeling Order and reiterated that "New-NGC shall not be subject to the commencement or continuation of litigation by any person on or on account of Unknown Asbestos Disease Claims pending exhaustion of the remedy or remedies provided by the [Trust]."

Finally, the assets of Old-NGC were transferred to New-NGC pursuant to an asset purchase agreement (the "APA"). The APA was expressly approved by the bankruptcy court's Confirmation Order and provided that New-NGC would not assume any asbestos-related liabilities, including Unknown Claims. In July 1993, the Plan was substantially consummated, and New-NGC issued to commercial creditors its securities, which subsequently were traded

in the public markets.

In May 1996, the Third Circuit set aside the *Georgine* settlement, and the Supreme Court affirmed that decision in *Amchem,* 521 U.S. at 629. This led directly to the filing of the present lawsuitSSthe Trust alleged that because it could no longer participate in the CCR facility, its assets would be insufficient to pay full tort values to all asbestos disease claimants. The Trust, as a result, looked for alternate funding for asbestos claimants and sought a determination that "the Plan Documents indicate New NGC has liability for the asbestos liabilities of Old NGC." Specifically, the Trust contended that the bankruptcy court's 1993 denial of the permanent injunction, the entry of the Channeling Order, and the findings made in support of those decisions indicated that New-NGC was liable for the Unknown Claims.

The bankruptcy court agreed with the Trust, stating that "the plan as confirmed by order of this court implicitly imposes or maintains liability on New-NGC for asbestos disease non-Bankruptcy Code claims not discharged by the confirmation order and not satisfied by the Trust." The court explained why this result was only "implicit":

> By implicitly addressing this asbestos liability, rather [than] explicitly doing so, and by deferring the matter as provided in the plan, the court enabled New NGC to emerge in the marketplace post-confirmation as an effective entity, poised, under the right market conditions to prosper, and thereby benefit all the constituencies.

In affirming the bankruptcy court, the district court acknowledged that "[w]hen viewed in isolation, certain provisions of the Confir-

mation Order, the Plan and the [APA] arguably support the Appellant's arguments that New NGC emerged from the bankruptcy proceedings without any liability for unknown asbestos claims." Nevertheless, the district court concluded that those provisions should be read in the context of the entire Plan, and it agreed that implicit in the Confirmation Order was the idea "that if the Trust had insufficient assets to satisfy the unknown claims, those claimants could look to New NGC."

## II.

New-NGC asserts that the Trust is not the real party in interest and, in a related argument, that the Trust does not have standing to seek the determination that New-NGC is liable for Unknown Claims. First, New-NGC argues that the real parties in interest are any potential Unknown Claimants who first exhaust Trust remedies without having their claims resolved, then obtain a judicial termination of the Channeling Order as to their claims, and finally bring their claims against New-NGC in non-bankruptcy courts based on applicable state law. New-NGC points out that no such claimants yet exist.

New-NGC asserts that the Trust has no substantive rights of its own against New-NGC, because the Plan and Confirmation Order contemplate that the Trust retain liability for *all* asbestos claims until its assets are exhausted. Thus, New-NGC ressons that because the Trust has no rights under substantive law against New-NGC, New-NGC cannot be the real party in interest.[2]

---

[2] *See Farrell Constr. Co. v. Jefferson Parish, La.*, 896 F.2d 136, 140 (5th Cir. 1990) ("[A] party not possessing a right under substantive law is not the real party in interest with respect to that right (continued...)

6

The Trust properly points out, however, that the real party in interest is "not necessarily the person who will ultimately benefit from the recovery." *See Farrell*, 896 F.2d at 140. Because the Plan charges the Trust with the ongoing duty of distributing the assets of the estate to the asbestos creditors, the substantive right the Trust seeks to be enforced is the right to have the bankruptcy court interpret and construe the Confirmation Order, Plan, and plan documents regarding matters as to which there is a substantial and immediate controversy.

Without the bankruptcy court's interpretation of the meaning of the Plan, the Trust will be faced with a fiduciary dilemma, in that it will be uncertain how to treat its beneficiaries, the Unknown Claimants. This dilemma exists because the trustees cannot know whether these future claimants ultimately will have a remedy against New-NGC, and, as a result, the trustees cannot know, with any certainty, whether the Trust must reduce the current pro-rata distribution under the Alternate Facility.

Therefore, the Trust properly has brought the current declaratory judgment action seeking a determination of whether, under the Confirmation Order and Plan, it can count on New-NGC to pay any of the Unknown Claims. Accordingly, the Trust is a real party in interest and has standing.

### III.
### A.

The parties dispute the standard of review of the bankruptcy court's interpretation of its 1993 Confirmation Order. New-NGC argues that because the interpretation of a court order is purely a question of law, our review must be *de novo*.[3]

The Trust responds by arguing that a court's interpretation of its own order should be entitled to deference if it is not plainly contradicted by the Plan documents.[4] The Trust notes that the bankruptcy court presided at the confirmation hearings, considered the relevant factual and legal arguments, made extensive findings and conclusions in connection with confirmation, and so developed a comprehensive understanding of the Plan. Thus, the Trust urges that a deferential standard is "eminently proper."

The proper reconciliation of these two positions is that we should review *de novo* the purely legal issues——e.g., the effect of the documents on New-NGC's liability for Unknown Claims——but should defer to the bankruptcy court's reasonable resolution of any ambiguities in those documents. Because New-NGC is correct that the bankruptcy court's ultimate determination of the meaning of the Plan and Confirmation Order is a legal one, however, the documents must truly be ambiguous, even in light of other documents in the record, before we will defer.

### B.

New-NGC argues that the district court

---

[2](...continued)
and may not assert it.").

---

[3] *See In re Schimmelpenninck*, 183 F.3d 347, 354 (5th Cir. 1999) (holding that in reviewing a bankruptcy court's order, we should perform "the same task as did the district court: review the bankruptcy court's findings of fact for clear error and issues of law de novo").

[4] *See County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1115 (2d Cir. 1997).

erred in deciding that the Plan provided that New-NGC would be held liable for any Unknown Claims that are unresolved following exhaustion of the Trust's assets. New-NGC asserts that rather than being liable under the bankruptcy Plan, it should be liable only if an asbestos claimant can overcome the additional hurdle of proving successor liability under applicable state law.

In adopting the Trust's position on this issue, the bankruptcy court admitted that there are no express statements in the Plan or Confirmation Order that affirm New-NGC's liability. Nevertheless, the court found such liability "implicit" in the Plan, reasoning that because it previously had rejected a permanent injunction against Unknown Claims, "the only reading that gives meaning to [the] findings of fact and conclusions of law [is] that this plan as confirmed by this court contemplated New NGC liability for claims not paid by the Trust and not otherwise discharged."[5]

The district court affirmed because, as it explained, the Confirmation Order stated that

New NGC shall not be subject to the commencement or continuation of litigation by any person on or on account of Unknown Asbestos Claims *pending exhaustion of the remedy or remedies provided by the [Trust].* The clear implica-

---

[5] In addition to challenging the underlying interpretation, New-NGC argues that it is never proper for a bankruptcy court to make an "implicit" ruling, particularly where that ruling conflicts with other express statements in the Plan. While this argument is thus styled as a separate ground for reversal, it relies wholly on the conclusion that the underlying interpretation is wrong. As a consequence, we need not address it separately.

tion of this statement is that once the [Trust] is exhausted, Unknown Claimants may commence litigation against [New-NGC]."

(Internal citations omitted.) In defending the bankruptcy court's and district court's decision, the Trust also argues that we should view New-NGC's current position as an attempt to relitigate the issues that were squarely presented to, and expressly rejected by, the bankruptcy court in the 1993 Plan and confirmation proceedings. The Trust points out that the 1993 order was never appealed and is, therefore, the law of the case.

But just because the Confirmation Order and Plan are binding does not answer the more difficult question of what those documents mean. Our duty is to read the Plan documents to determine what is the best interpretation of the court's intent with respect to New-NGC's liability for Unknown Claims. In this respect, New-NGC correctly notes, as an initial matter, that there are at least three positions the Plan could have adopted: (1) New-NGC could be immune from Unknown Claims; (2) New-NGC could be liable for Unknown Claims that were not resolved by the Trust, but only to the extent of state law successor liability; or (3) New-NGC could have been liable for all Unknown Claims once the Trust was exhausted.

The bankruptcy court rejected the first of these positions when it determined that it did not have jurisdiction permanently to enjoin Unknown Claimants from suits against New-NGC. The bankruptcy court, district court, and the Trust make an immediate leap from the rejection of this first position to an adoption of the third position as the one "implicit" in the 1993 orders. This leap is

apparent in the Trust's argument that because the commercial creditors' BT Committee opposed the Channeling Order and its temporary injunction, they

> knew that under the confirmed Plan New-NGC would be liable for Unknown AD Claims to the extent, if any, that the Trust proved unable to resolve those Claims. Indeed, they objected (unsuccessfully) to NGC's third Technical Modifications on this very ground, asserting that the modification would subordinate the majority of the claims currently held by NGC's bond and trade creditors to an undetermined amount of asbestos liability.

The Trust's conclusion does not flow inevitably, however, from the commercial creditors' objections. It is possible that these creditors were objecting to the imposition on New-NGC of *any* risk of liability, including the (apparently) smaller risk of successor liability under state law. Because the previous Draft Plan would have provided New-NGC with *absolute* immunity from *all* asbestos claims, either the second or third interpretations would represent a less desirable reorganization plan for these creditors, and either would have motivated them to object.[6] Thus, New-NGC ar-

---

[6] The dissent ignores this observation, thereby reflecting same error as did the bankruptcy court, the district court, and the Trust, stating that "[o]ver the protest of Gypsum creditors who would own the New-NGC the bankruptcy court refused to protect it from future unknown claims." Like the Trust, however, the dissent assumes this conclusion solely from the fact that the court rejected a permanent injunction against Unknown Claims, and it fails to point to any language in the approved Plan or Confirmation Order that indicates that

(continued...)

gues that it was erroneous for the bankruptcy court to treat the failure to create a permanent injunction against future asbestos claims as the equivalent of imposing liability for those claims on New-NGC.

Likewise, the isolated statements pointed to by both parties do little to resolve the interpretive question. The Trust emphasizes a statement contained in the transcript from the January 1993 bankruptcy ruling that "Non-Bankruptcy Code claimants must be able to pursue their remedies in the future after the exhaustion of the trust." But once again, either the second or third interpretation would be consistent with this statement, for the court could have intended that state-law successor liability would be sufficient, or, alternatively, the court could have been referring to an immediate liability on exhaustion of the Trust.

Somewhat more informative are statements New-NGC points to from the February 1993 hearing, wherein the court specifically addressed the issue of New-NGC's liability for Unknown Claims should the Trust be exhausted, noting:

> The Court has already provided that if these future claimants are [not] satisfied, there is no permanent injunction and then that triggers the dispute is new NGC *a successor*, what liability is there under whatever the *applicable corporate law* would be. . . . My concern is if you start getting into the dispute on document drafting, you will

---

[6](...continued)

NewNGC, instead of accruing the more limited form of state-law successor liability, would be liable for all Unknown Claims once the Trust was exhausted.

be necessarily changing by corporate document what the Court would anticipate would just be whatever the application is of the *appropriate jurisdiction statute. . . .* My only concern is if you're not in dispute as to what to put on any document with a new entity, maybe that's simply left better to the application of *whatever governing law would be, nonbankruptcy governing law*, in the event that there's anything to fight about, in the event that some claims in the future . . . they can proceed with their rights, and new NGC can *defend and say we're not a successor*.

(Emphasis added.) New-NGC asserts that these discussions form the context for the final version of the Plan, the Confirmation Order, and the APA and that the bankruptcy court's comments reflect its understanding, at that time, that even though there would be no permanent injunction preventing Unknown Claimants from seeking damages from New-NGC if the Trust were exhausted, nevertheless those claims against New-NGC would still have to meet the requirements for state-law successor liability.

The Trust downplays these comments, suggesting they are merely part of a discussion about what was then a completely speculative and hypothetical event (the likelihood that the Trust would ever be exhausted). It argues that these statements cannot, as a matter of law, substitute for what is in the Confirmation Order and Plan. The Trust is correct that the Plan and Confirmation Order form the basis of the binding agreement between the debtors and creditors, and any determination of the extent of New-NGC's liability for the Unknown Claims must flow from those documents. Nonetheless, where there is ambiguity in the documents, and especially where there is a dispute as to what the parties understood them to mean, extrinsic evidence such as this should inform our analysis.

That notwithstanding, the best indication of the bankruptcy court's intent with respect to these Unknown Claims still can be found in the documents themselves. First, and most importantly, New-NGC points to the Channeling Order, because it is the disputed provision that represents the most significant modification of the Draft Plan. The Channeling Order provided as follows:

Channeling OrderSSUnknown Disease Claims.

(1) Injunction and Channeling Order. Pursuant to Section 6.5(b) of the Plan, all Persons who have held, hold, or may hold Unknown Asbestos Disease Claims are made beneficiaries of the [Trust] and, pending exhaustion of the remedies of that Fund to resolve Unknown Asbestos Disease Claims, are enjoined (subject, however, to the provisions of Section 10(b)(2) of this Order) on and after the Confirmation Date from . . . commencing or continuing in any manner any action or other proceeding of any kind with respect to such Unknown Asbestos Disease Claim against the Debtors, New NGC, Reorganized NGC, or any of their respective officers, directors, employees, representatives, Affiliates or Subsidiaries (other than Austin or its Subsidiaries), the Insurance Companies, *or any other Person . . . .*

(2) Limitations on Injunction and

10

Channeling Order Regarding Asbestos Disease Claims. Nothing contained in Section 10(b)(1) of this Order, however, shall preclude an Unknown Asbestos Disease Claimant from pursuing his rights, if any, *under applicable non-bankruptcy law against any Person* who may be liable to such Unknown Asbestos Disease Claimant after exhausting the remedy or remedies provided by the [Trust].

(Emphasis added.)

New-NGC points to the quoted language for its conclusion that Old-NGC's tort liability to non-Code claimants does not attach automatically to New-NGC. Specifically, New-NGC notes that section 10(b)(2) covers *any* "Person," not just New-NGC, and that the rights of Unknown Claimants are limited to "rights, if any, under applicable non-bankruptcy law." New-NGC argues that, as a result, because the Trust must recognize that no automatic liability arose against all "Persons,"[7] therefore the Trust must argue that the Channeling Order somehow designated that only New-NGC would automatically succeed to Old-NGC's liabilities. But as the plain language of that order reflects, nothing in these provisions singles out New-NGC for special treatment, and New-NGC instead is dealt with in § 10(b)(2) the same as is any other Person.

New-NGC correctly observes that, consequently, the only sensible reading is that all Persons, including New-NGC, were exposed to the possibility that Unknown Claimants might some day be allowed to pursue a remedy against them *if one existed under applicable non-bankruptcy law.* In contrast, the Trust's reading would lead to the unlikely conclusion that the bankruptcy court intended that all "Persons" would be automatically liable if the Trust's assets were exhausted.

The next provision pointed to by New-NGC is section 6 of the Confirmation Order, which expressly approves the APA and orders that the assets sold thereunder are to be transferred to New-NGC "free and clear of all Liens, Claims, Interests and other liabilities, obligations, charges or encumbrances thereon or thereagainst . . . to the maximum exten[t] permitted by the Bankruptcy Code." Because New-NGC, a newly-created corporation, cannot automatically succeed to the liability of Old-NGC without some affirmative act (whether explicit or implicit) of the bankruptcy court, this provision further supports New-NGC's argument that the bankruptcy court never intended to take such necessary action to transfer liability.

In fact, the natural inference from this provision is that the court intended New-NGC to assume only "Liens, Claims, Interests and other liabilities" that were *specifically* assigned or transferred in other parts of the Confirmation Order; otherwise, New-NGC would be "free and clear . . . to the maximum extent permitted by the Bankruptcy Code." The plain language of the Confirmation Order therefore refutes the bankruptcy court's finding of "implicit" liability.

As further support for its position, New-NGC notes that section 5.2(d) of the Plan provides that New-NGC is not responsible for asbestos liabilities: "Upon consummation of the

---

[7] Significantly, "Person" is defined broadly, under the Plan, as "any individual, firm, corporation, association, partnership, joint venture, trust, or other entity."

11

Merger and this Plan, New-NGC shall perform all of the obligations of the Debtors under this Plan (*except for the obligations regarding the Asbestos Claims which shall be the sole responsibility of the [Trust]*." (Emphasis added.) "Asbestos Claims" are defined in the Plan to include both current and Unknown Claims.

Finally, for textual support, New-NGC relies on provisions of the APA, which were approved by the bankruptcy court in the Confirmation Order. Section 2.1(b) of the APA states that New-NGC will not have liability for any asbestos claims (including Unknown Claims): "<u>Exclusions to Assumptions</u>. Notwithstanding anything contained in this Section 2.1 to the contrary, [New-NGC] shall not assume, covenant to pay, perform, observe the terms of, satisfy and/or discharge any liability or obligation of [Old-NGC] to the extent such liability and obligation: (i) relates to Asbestos Claims. . . ." The APA adopted the definition of "Asbestos Claims" in the Plan, and, as we have said, that term includes Unknown Claims.

In challenging all these statements supporting New-NGC's position, the Trust relies primarily on the same reasoning as did the district court, which felt these statements and provisions are taken out of context and do not reflect a coherent reading of the documents as a whole.[8] As the court stated,

When viewed in isolation, certain provisions of the Confirmation Order, the Plan and the Asset Purchase Agreement arguably support the appellant's arguments that New NGC emerged from the bankruptcy proceedings without any liability for unknown asbestos claims. However, as the bankruptcy court explained, "the plan and its implementing documents must be read coherently, giving meaning to all its provisions and terms, but doing so consistent with the confirmation order, which governs. The plan and its implementing documents cannot be read to render any provision of the confirmation order meaningless or superfluous."

(Internal quotations omitted.)

In so stating, the district court erred in at least two respects. First, New-NGC does not claim that it "emerged from the bankruptcy proceedings without any liability for unknown asbestos claims." Although this was the first of the three positions the bankruptcy court could have taken, all sides acknowledge that that option was expressly rejected when the permanent injunction was denied. Instead, New-NGC takes a more restrained position, asserting that it emerged with a more limited form of liability, state-law successor liability.

Second, the bankruptcy court's and district court's desire to avoid "render[ing] any provision of the confirmation order meaningless or superfluous" is commendable, but that interpretive tool leads to a conclusion

---

[8] Notably, the dissent also offers no theory of how or why we should ignore the plain language of the Plan documents to reach the result desired by the Trust. Instead, the dissent criticizes the majority for having "chosen their own meaning of the 1993 order," but it does not tell us what is erroneous about our interpretations of the Channeling (continued...)

[8](...continued)
Order, section 6 of the Confirmation Order, section 5.2(d) of the Plan, or section 2.1(b) of the APA.

opposite to the one those courts reached. To reject the multiple statements advanced as support by New-NGC as contrary to the "implicit" meaning of the Confirmation Order is to render *those* statements meaningless or superfluous. In contrast, neither the Trust nor the bankruptcy or district court has pointed to language that would be superfluous under New-NGC's more modest reading of successor liability.

The district court decided that New-NGC's theory would render the entire Channeling Order meaningless, reasoning that "if New NGC was not to have any liability for unknown asbestos claims, the channeling order would have been unnecessary." But once again, this logic is built on the faulty premise that New-NGC is arguing for absolute immunity. As we have shown, the rejection of the permanent injunction, followed by imposition of the Channeling Order, is just as consistent with the theory that the bankruptcy court wanted to impose at least state-law successor liability on New-NGC. Our textual analysis of the Channeling Order demonstrates that the state-law-successor-liability theory was the most reasonable interpretation.

Similarly deficient is the district court's conclusion that because "the Confirmation Order barred punitive damages by unknown asbestos claimants against New-NGC, [t]his indicates that the order contemplated that New-NGC would be liable for other types of damages." While this statement is correct, it does nothing to undermine New-NGC's state-law-successor-liability theory; the bankruptcy court simply may have been closing the door to punitive damages even under the more limited form of non-bankruptcy-law liability.

On the other hand, the Trust may be correct

that the bankruptcy court's bar on punitive damages evinces an intent on the court's part to impose liability on New-NGC. That is, if the court intended to leave all questions of New-NGC's liability to state-law successor doctrine, it might seem odd that it would express any opinion on whether punitive damages could be recovered under state law.

But to the extent that this observation about intent is correct, we should nevertheless reject it as a matter of law. This is so because once the bankruptcy court had determined that Unknown Claims were not "claims" within the meaning of § 101(5) of the Bankruptcy Code, it no longer retained jurisdiction to limit punitive damages awards in favor of these claimants.[9]

New-NGC correctly notes that it is inherently inconsistent for the bankruptcy court to rule that it is without the power permanently to enjoin Unknown Claims because they do not fit within section 101(5), but then to hold, nevertheless, that New-NGC will be liable for those claims once the Trust is exhausted. This impermissibly benefits Unknown Claimants, who do not hold Code claims, in relation to other non-Code creditors, who would have to prevail under state-law

---

[9] The dissent argues that this "is a curious response to the obvious point that the bankruptcy court is assuming the same liability of New-NGC in the channeling facility, rather than contemplating 'state-law' litigation." But the dissent misses the point that the bankruptcy court could not impose liability on New-NGC for Unknown Claims, which were not properly within the bankruptcy system at all. Thus, even if the bankruptcy court were not contemplating "state-law" litigation, it did reason that it had no jurisdiction over future claims, and, accordingly, those claims should be handled outside of bankruptcy.

successor theories. Similarly, the district court's bar on punitive damages for Unknown Claims impermissibly disadvantages Unknown Claims relative to other non-Code creditors who are free to pursue punitive damages. Thus, we reject the argument that the punitive-damages bar has any bearing on New-NGC's liability for Unknown Claims, which were determined to be outside of the bankruptcy court's power to enjoin.

In a failed attempt at its own textual analysis, the Trust argues that because the court recognized that "[N]ew NGC may transfer additional assets to the [T]rust in the future," therefore this right to add funds would make sense only if New-NGC also has liability for the Unknown Claims. New-NGC cogently points out, however, that the right to add funds is a recognition not that New-NGC would retain liability for Unknown Claims, but instead that it provides New-NGC an option to shield itself even from successor liability.

If New-NGC determines that it would be better off funding the Trust than defending against future state-law asbestos claims,[10] the Plan affords it this option. The court's statement is consistent, therefore, with New-NGC's theory that the bankruptcy court believed that New-NGC might want to retain the ability to extend the temporary injunction by continuing to fund the Trust.

Thus, the Trust and district court point to no provisions of the Confirmation Order or the Plan that lead to the conclusion that New-NGC was necessarily to be liable for the

Unknown Claims should the Trust fail to satisfy them. Neither attempts to argue for alternative interpretations of the provisions set forth by New-NGC; instead, they rely solely on their theory that these are mere "isolated" statements in the documents. New-NGC, on the other hand, points to multiple statements in the record, and numerous provisions in the relevant documents, that are consistent *only* with its position that it should not be liable to the Unknown Claims unless they can establish state-law successor liability.

Proper textual interpretation does not allow us to ignore those statements or to adopt an "implicit" meaning that would render all these provisions meaningless, and we need not defer to the bankruptcy court's interpretation of this unambiguous text. Nor does our interpretive role require us to ignore other extrinsic evidence, such as the bankruptcy court's discussion of non-bankruptcy law and successor liability, that is consistent with the text.

In light of the Plan and Confirmation Order, then, it is unlikely that the bankruptcy court intended that non-Code claimants, who may have no right to recover against New-NGC under applicable state law, nevertheless are entitled automatically to a Code remedy against New-NGC. Thus, all of these sources lead to the conclusion that, although the bankruptcy court determined that it did not have the power permanently to enjoin Unknown Claimants from seeking recovery from New-NGC on exhaustion of the Trust, the court did not impose any certain liability on New-NGC.

C.

In the alternative, the Trust asserts that the structure of Old-NGC's reorganization Plan makes New-NGC the *de facto* reorganized

---

[10] For example, New-NGC may determine that its expected costs of litigation exceed the amount of funding needed to ensure continued viability of the Trust.

14

debtor. Relying on *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1274, 1278 (5th Cir. 1994), the Trust notes that, under bankruptcy law, the reorganized debtor remains liable for any debt that is not discharged under the plan. Thus, the Trust explains that, in effect, the rights and obligations of Old-NGC were transferred to New-NGC, and, because the Unknown Claims were not discharged by the Plan, New-NGC will be liable for them on exhaustion of the Trust.

As support, the Trust points to the following evidence: (1) New-NGC was capitalized with approximately $350 million of assets of Old-NGC; (2) to receive favorable tax treatment, New-NGC was required to carry on the business of Old-NGC; (3) New-NGC retained Old-NGC's attorney-client privilege, even as against Old-NGC and ACMC; (4) Old-NGC's management had authority under the Plan to elect two of the directors of New-NGC, and the remaining directors were elected by the commercial creditors; (5) New-NGC retained the corporate name "National Gypsum Company"; (6) New-NGC's stock was not sold to unrelated third parties in an arms-length transaction, but instead was distributed to Old-NGC's commercial creditors, and the same person executed the APA for both the buyer and seller; and (7) the bankruptcy court stated that New-NGC would carry on and preserve the business of the debtor and that only those assets given to the Trust would be liquidated.

While all this evidence is consistent with the Trust's theory that New-NGC is the reorganized debtor following bankruptcy, New-NGC points to its own evidence that Old-NGC, not New-NGC, emerged from the bankruptcy proceeding as "Reorganized NGC" under the Plan. First, New-NGC cites the plain language of the bankruptcy documents. It notes that the Plan defined "Reorganized NGC" as "NGC, on and after the Effective Date, which entity shall be . . . the successor to NGC for all purposes." Thus, in a prior appeal, we recognized that the Trust "became the sole shareholder of the reorganized National Gypsum (which, in turn, became known as 'Asbestos Claims Management Corporation (ACMC)'." *Insurance Co. of N. Am. v. NGC Settlement Trust (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1059 (5th Cir. 1997). In contrast, "New NGC" means "a Delaware corporation to be formed pursuant to this Plan, and which shall do business from and after the Effective Date as '*National Gypsum Company*.'"

Similarly, the Trust Agreement provides that "[t]he purpose of the Trust is to assume any and all liabilities *of the Debtors*" (emphasis added), and the Channeling Order provides for an injunction of actions against, among others, "the Debtors, New NGC, [or] Reorganized NGC," suggesting that New-NGC and the reorganized debtor are not the same entity under the Plan. Thus, treating New-NGC as the reorganized debtor is contrary to the plain language of the documents.

New-NGC also points out that the Trust's reliance on *Lemelle* is misplaced and that that decision actually supports New-NGC's contention that Old-NGC/ACMC remains the reorganized debtor. In *Lemelle*, the debtor corporation, Winston, sold its operating assets, during bankruptcy, in two separate transactions, leaving it with miscellaneous non-operating assets. *See Lemelle*, 18 F.3d at 1270. Following the discharge, Winston (through its successor) was sued for an act it had committed before the bankruptcy. It defended, arguing that it had not succeeded to

15

any pre-bankruptcy liability, because it had not retained the operating assets of the debtor, and therefore it was liquidated. We rejected that argument, concluding that Winston had not been liquidated and that the liability was not one that had been discharged in the Winston bankruptcy. *See id.* at 1273.

In rejecting Winston's argument that it had been liquidated, we refused to apply the "de facto liquidation" theory expressed in *Erie Lackawanna Ry. v. Henning,* 803 F.2d 881 (6th Cir. 1986). Instead, we concluded that the Sixth Circuit's theorySSwhich provided, in the "admittedly unique" situation of a railroad debtor, that although the debtor "had gone through reorganization in form, in substance it had been liquidated"SSlacked applicability outside the Rail Act context. *See Lemelle*, 18 F.3d at 1273 n.3. The lack of a formal liquidation in *Lemelle*, then, was dispositive of Winston's claim that a liquidation had occurred. *See id.* at 1273.

Thus, far from supporting the Trust's position, *Lemelle* is an example of the original debtor's remaining liable for non-Code claims, even where the operating assets were sold to another party. Indeed, the sale of the operating assets in *Lemelle* did not even contain the same restrictive language found in New-NGC's sale agreement with the commercial creditors.[11] Consequently,

*Lemelle* teaches that, because the Trust cannot establish that Old-NGC was formally liquidated, therefore Old-NGC remains the reorganized debtor following bankruptcy.

As we have pointed out, the APA provided for a limited assumption of liabilities and expressly disavowed assumption of any current or future asbestos claims. Moreover, Old-NGC was no "empty shell" following bankruptcy: It retained hundreds of millions of dollars of assets, including the stock of the Austin Company, and it is still paying asbestos claims and suing insurance companies. Nothing about these circumstances suggests that the Trust and ACMC did not continue as Old-NGC's reorganized debtor.

The Trust makes much of the fact that the sale of Gold Bond was to Old-NGC's commercial creditors; it argues that because the sale was not an "arms-length" transaction, we should not allow these creditors to escape the conclusion that New-NGC is just a reorganized form of the old debtor. New-NGC cannot be a new corporation free from Old-NGC's non-discharged debts, the Trust argues, because the commercial creditors paid no new consideration for the operating assets. Thus, by concluding that New-NGC is liable only under a state-law successor theory, we are shielding New-NGC's new ownersSSwho were Old-NGC's old commercial creditorsSSfrom non-dischargeable liabilities. The Trust warns that we are sanctioning a "ruse"

---

[11] In *Lemelle*, we ultimately rejected the argument that the party that had purchased Winston's operating assets was liable for the pre-bankruptcy claims, because the terms of the purchase agreement were not properly submitted by Winston in response to summary judgment. *See Lemelle,* 18 F.3d at 1274. Nevertheless, the purchase language that did appear in the order was not
(continued...)

[11](...continued)
as restrictive as that in the APA, *see id.*, and the underlying point remains true: The Trust's theory that non-Code claims were assumed automatically by the purchaser of the debtor's operating assets is at least as doubtful in this case as it was in *Lemelle*.

and inviting future debtors to advocate bankruptcy plans that incorporate this strategy.[12]

Much of this rhetoric is dependent on the underlying argument that New-NGC, and not Old-NGC, is the reorganized debtor. But the Trust offers no principled reason why the fact that Gold Bond was purchased by Old-NGC's commercial creditors should outweigh all the textual evidence that Old-NGC/ACMC is the reorganized debtor under the Plan. It seems that the Trust's primary concerns seem to be with bankruptcy policy and the implications for future reorganization plans.

There is, however, good reason why we would want to encourage these types of reorganizations and to enforce the express terms of the deal to which the parties have agreed. All sides were adequately represented during bankruptcy proceedings, and legal representatives were appointed for current and future asbestos claimants and for commercial creditors and the company.[13] Negotiations

were extensive, and the legal representative of the Unknown Claimants successfully blocked court approval of the Draft Plan, which permanently would have enjoined even state-law successor claims against New-NGC. Still, despite this setback, the commercial creditors were willing to give more in value to Old-NGC for Gold Bond than were any other purchasers, and we should be hesitant to change the terms of the deal after the fact just because subsequent developments in the *Georgine* settlement have resulted in the Unknown Claims' being underfunded in the Trust.

This is not a case in which Old-NGC has won approval of a plan to bail out its shareholders, "forcing asbestos victims to surrender their claims in exchange for a meager" portion of the company's assets. *See Flanagan*, 90 F.3d at 993 (5th Cir. 1996) (Smith, J., dissenting). Instead, Old-NGC's chapter 11 bankruptcy was motivated at least as much by the $1.1 billion owed to bond and trade creditors as by the $800 or $900 million estimated liability for current and future asbestos disease claims. The bankruptcy court adopted a Plan whereby all the current and future asbestos claims were expected to be paid in full by the Trust, while the bond and trade creditors received only $350 million in assets in exchange for their $1.1 billion in claims.[14] This $750 million reduction in debt

---

[12] In this way, the Trust seemingly hopes to equate this with earlier warnings in other asbestos litigation. For example, in *Flanagan v. Ahearn (In re Asbestos Litig.)*, 90 F.3d 963, 994 (5th Cir. 1996) (Smith, J., dissenting), *vacated*, 521 U.S. 1114 (1997), appeared the warning that "[t]he majority's unequivocal approval of Fibreboard's litigation strategy undoubtedly will lead other financially threatened companies throughout the nation to utilize it as a road map for sheltering their assets and improperly restricting the rights of their present and future victims." (Internal quotations and punctuation omitted.)

[13] This is in stark contrast to the facts of *Flanagan*, in which it was noted that, by removing the settlement from the bankruptcy context, Fibreboard
(continued...)

[13](...continued)
denied the class of asbestos claimants the right to vote on the proposed settlement. *See id.* at 996 (Smith, J., dissenting).

[14] Thus, because the bankruptcy court did not foresee that the CCR would be disapproved and the Trust would be insufficient to fund both current and future asbestos claims, it is not, as the dissent suggests, "incredible to believe that the bankruptcy
(continued...)

was sufficient "consideration," notwithstanding the Trust's arguments to the contrary.

Although the CCR ultimately was disapproved, there is no reason to believe that Unknown Claimants are now getting a worse deal under the Alternate Facility than commercial creditors originally received under the Plan; there are, after all, hundreds of millions of dollars in Insurance, Austin, and other assets in the Trust. Consequently, none of the Trust's concerns about the implications of shielding the bond and trade creditors from more liability is especially compelling, and those concerns certainly are insufficient to overcome the plain language of the Plan documents.

---

[14](...continued)
court would create this new operating company with debtor assets, after holding that it had no authority to extinguish unknown asbestos claims of the debtor, and then leave it to state law governing successor liability to resolve the future asbestos liability of its mutant creation." Rather, the bankruptcy court simply entered a compromise agreement whereby the largest group of creditors, the commercial creditors, would receive something of value in return for their $1.1 billion in debt, while the asbestos claimants would receive everything else.

Then, when subsequently it became apparent that the Trust would be insufficient to fund Unknown Claims, the bankruptcy court unreasonably altered the meaning of the Plan documents to hold that future asbestos claimants could go after NewNGC. While this impulse may have been noble, and perhaps even socially desirable, the bankruptcy court cannot now ignore the plain meaning of the documents that created New-NGC as a separate operating company with no liability as a reorganized debtor.

## IV.

In the end, then, both of the Trust's arguments fail. First, notwithstanding the bankruptcy and district courts' findings to the contrary, there is nothing "implicit" in the Plan documents or other bankruptcy court orders that provides that New-NGC will automatically succeed to Old-NGC's liability for Unknown Claims. Instead, the express terms of the Plan compel the opposite conclusionSSi.e., that New-NGC will be liable only under non-bankruptcy, state-law successor liability. We see no reason to ignore the plain meaning of these Plan documents.

Second, Old-NGC and New-NGC are not the same entity. Under the Plan, Old-NGC became ACMC, a subsidiary of the NGC Settlement Trust. New-NGC was formed as a new corporation created to purchase the assets of Gold Bond for Old-NGC's commercial creditors. Pursuant to the Asset Purchase Agreement, New-NGC did not assume liability for asbestos claims, whether known or unknown. In exchange, its shareholders surrendered approximately $750 million in net claims it held against Old-NGC, and it took $350 million in assets "free and clear of all liens. Thus, because there are no other provisions in the Plan that allocated the liabilities for asbestos claims from Old-NGC to New-NGC, New-NGC cannot be considered to have assumed those debts, and it is not the reorganized debtor.

By contrast, the Trust documents expressly contemplate that the Trust and its subsidiary, Old-NGC/ACMC, assume liability for all asbestos claims. The Plan also expressly provides that Old-NGC/ACMC is "Reorganized NGC." The Trust has not presented any compelling evidence why we should ignore the plain meaning of all these

documents, nor has it presented a plausible argument that it is not the reorganized debtor following bankruptcy.

Accordingly, the judgment of the district court, affirming the order of the bankruptcy court, is REVERSED and REMANDED to the district court for further proceedings, as appropriate.

ENDRECORD

REAVLEY, Circuit Judge, dissenting:

The majority have chosen their own meaning of the 1993 order of the bankruptcy court by leaving future asbestos claimants to tort actions against Gypsum without recourse to the claims resolution facility of the bankruptcy order. I would follow the bankruptcy court's own construction of its order and avoid adding to the delay and lawyer fees for asbestos victims, a result that joins the ongoing judicial contribution to the asbestos debacle.[15] I dissent.

The 1993 order confirming the plan provided in section 9(b) that New-NGC "shall not be subject to the commencement or continuation of litigation by any person on or on account of Unknown Asbestos Disease Claims pending exhaustion of the remedy or remedies provided by the NGC Asbestos Settlement Fund," i.e., the fund administered by the Trust. Again, in the "channeling order" that is section 10(b) of the confirmation order, all persons holding an unknown asbestos claim are enjoined from suit against New-NGC "pending exhaustion of the remedies of the" Trust settlement fund. If the court was not directing that, if necessary, New-NGC assets followed Trust assets in the settlement facility, it was lifting its injunction and allowing an entirely new track for the claimants who waited for the second track to begin. While lawyers for the claimants could not count on better recoveries when the track changed, because New-NGC had the option of adding assets to the Trust Fund, the lawyer fees could be larger. This able bankruptcy judge would have recognized the vice of that scheme and would have avoided it.

---

[15] For example, see <u>Ortiz v. Fibreboard Corp.</u>, 527 U.S. 815, 119 S. Ct. 2295 (1999).

When the financial creditors, who were to own New-NGC, objected to the court's channeling order for the reason that it "subordinates the majority of the claims currently held by NGC's bond and trade creditors to an undetermined amount of asbestos liability," the court rejected this objection. Over the protest of Gypsum creditors who would own the New-NGC the bankruptcy court refused to protect it from future unknown claims but, as if the bankruptcy court had not decided the matter, this majority opinion holds that the bankruptcy court did not "transfer liability." But then the majority relents and restrains the transfer to the more limited "state-law successor liability."

Then there is the provision of the order at section 9(c) that expressly bars punitive damages by unknown claimants against New-NGC. The majority opinion dismisses this on the ground that the bankruptcy court had no authority to limit those damage awards because they were not "claims" within the meaning of the Bankruptcy Code. That is a curious response to the obvious point that the bankruptcy court is assuming the same liability of New-NGC in the channeling facility, rather than contemplating "state-law" litigation.

The bankruptcy court, in ruling in the pending adversary action, said: "With all due respect to the learned and considered arguments of counsel, the only reading that gives meaning to these findings of fact and conclusions of law are that this plan as confirmed by this court contemplated new NGC liability for claims not paid by the Trust and not otherwise discharged." The district court followed the law and gave deference to the bankruptcy court's interpretation of its own confirmation order. See Farmland, Inc. v. Anel Eng'g

21

Indus., Inc.[16] ("We see no basis for substituting our judgment for that of the district judge in interpreting his own order.").  The bankruptcy judge will find demoralizing the majority conclusions that he "never intended" or "wanted to impose" a channeling liability after exhaustion of the Trust assets, or that the judge would reach this strange "state-law successor liability" and then forget that he had so ruled.  Actually, it is incredible to believe that the bankruptcy court would create this new operating company with debtor assets, after holding that it had no authority to extinguish unknown asbestos claims of the debtor, and then leave it to state law governing successor liability to resolve the future asbestos liability of its mutant creation, without leaving so much as a footnote in the controlling documents suggesting such an intent.  This appellate court should reject the incredible and stay with the judgment of the bankruptcy court.

---

[16]  693 F.2d 1140, 1146 (5th Cir. 1982) (quoting SEC v. Sloan, 535 F.2d 679, 681 (2d Cir. 1976)).

22